# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| K & P AUTOMOTIVE, Inc. | ) | No. 06 B 10562 |
| | ) | |
| _____ | ) | |
| In Re: | ) | Chapter 11 |
| | ) | |
| ASHOK PARIDA | ) | No. 06 B 10563 |
| | ) | |
| | ) | Judge Carol A. Doyle |

## MEMORANDUM OPINION

K&P Automotive, Inc. is a chapter 11 debtor that operates a car repair business. Its former landlord, Newcastle Properties, LLC, filed a claim asserting breach of contract against K&P and breach of a guaranty provided by Ashok Parida, the owner and manager of K&P. Parida is also a chapter 11 debtor in a related case. K&P and Parida filed objections to the claims of Newcastle. A joint trial was held on the claim objections.

The following are the court's findings of fact and conclusions of law with respect to the debtors' objections to Newcastle's claims. Because K&P did not breach its lease agreement with Newcastle, the court sustains the debtors' objections and disallows Newcastle's claims against both K&P and Parida.

## I.    Procedural Background

Before K&P and Parida filed their bankruptcy petitions, Newcastle filed an action against both of them in the Circuit Court of Cook County, Illinois. Newcastle is the agent for Norcor Autocare Associates, LP ("Norcor"), the owner of the property at which K&P operated its business for six of the ten years covered by the debtor's lease. Newcastle alleged breach of the lease agreement and related causes of action against K&P, and breach of the guaranty of K&P's lease obligations against Parida. In March 2006, the Circuit Court entered a judgment against K&P and Parida in the amount of $164,000, plus costs. The judgment was based in part on requests to admit served by Newcastle on the debtors to which the debtors did not timely respond. The debtors were deemed to have admitted the matters covered in those requests to admit under Illinois Supreme Court Rule 216.

The debtors appealed the judgment to the Illinois Appellate Court, which reversed and remanded. The Appellate Court concluded that some of the matters deemed admitted were conclusions of law that were not the proper subject of requests to admit. It remanded for a new trial to be conducted without reliance on the requests to admit that dealt with legal issues rather than facts.

The debtors filed this bankruptcy case before the Appellate Court decided the appeal. No further proceedings have been held in the Circuit Court after the remand. Newcastle never moved to lift the stay to permit the Circuit Court to conduct a retrial. Eventually, the debtors filed objections to the claims of Newcastle in this court and the matter was set for trial.

## II.    Effect of State Court Requests for Admission

At the trial, Newcastle argued that the admissions the debtors made by failing to respond to requests to admit regarding factual issues in the state court proceeding were binding on the debtors in this proceeding.   The debtors did not appear to contest this, and in fact they stipulated in the Joint Pretrial Statement to many, but apparently not all, of the factual assertions made in the state court requests to admit.  Newcastle argues that all of the admissions made by failing to respond to requests to admit in state court are binding in this court.

Newcastle has failed to identify a single alleged state court admission that is material to this matter to which the debtors did not stipulate.   Even if it had, however, those admissions are not binding in this proceeding.  Illinois Supreme Court Rule 216(c) provides that a request to admit is deemed admitted unless the responding party serves a sworn response or objection within 28 days of service.  Ill. Sup. Ct. R. 216(c).  Rule 216(e) expressly provides, however, that the admissions do *not* apply in any other proceeding.  It states, "Any admission made by a party pursuant to a request under this rule is for the purpose of the pending action and any action commenced pursuant to the authority of section 13-217 of the Code of Civil Procedure (735 ILCS 5/13-217) only.  It does not constitute an admission by him for any other purpose and may not be used against him in any other proceeding." Ill. Sup. Ct. R. 216(e).  Thus, the rule itself could not be more clear in providing that any admission made by a party under Rule 216 cannot be used against him in any other proceeding.

Even if Rule 216 did not contain this language, however, the admissions would not apply in this proceeding.  Under the doctrine of collateral estoppel, factual or legal conclusions made in

-3-

a state court proceeding can be binding in bankruptcy court. In re Wronke, 172 F.3d 54, 54 (7th

Cir. 1998). Collateral estoppel applies, however, only when four requirements are met:

> (1) the issue decided in the prior litigation was identical to the current one;
>
> (2) there was a final judgment on the merits;
>
> (3) the party against whom estoppel is asserted was a party to the prior action or in
> privity with it; and
>
> (4) the factual issue at stake has actually and necessarily been litigated and determined in
> the prior action.

LaSalle Bank Nat'l Ass'n v. Vill. of Bull Valley, 355 Ill. App. 3d 629, 635 (Ill. App. Ct. 2005).

No final judgment on the merits has been entered in the state court proceeding against the

debtors. Therefore, no factual or legal conclusions of the state court are binding in this court.

The debtors' failure to respond to requests for admissions in the state court proceeding has no

effect in this proceeding.


### III.    Findings of Fact

The court makes the following findings of fact based on the evidence presented at trial

and the stipulations of the parties:

1.      On January 1, 1992, K&P and Argent Group (Norcor's predecessor) executed a

written lease agreement for space 21 at an auto service center located at Route 59 and South

Road in Aurora, Illinois. The center is a strip mall containing eight or nine spaces intended for

businesses providing services related to automobiles. Space 21 is the corner space with the most

visibility from the main road.

2.      Parida is the owner and manager of K&P. On January 10, 1992, Parida signed a written guaranty of K&P's obligations under the lease.

3.      Although section 1.01 and Exhibit A of the lease identify the leased space as the space in the western corner of the building (referred to by the parties as space 21), with the agreement of Argent, K&P moved into both space 21 and space 19 at the beginning of the lease term in 1992. Space 19 is adjacent to space 21. K&P continued to occupy both spaces from 1992 until it vacated the premises on December 31, 2001 at the end of the lease term.

4.      During the entire term of the lease, space 21 had a pedestrian entrance, customer waiting area, service counter, partitioned office area, and restroom facility. The majority of the space consisted of partitioned areas that could not be used for repairing cars. Space 21 had only 120 volt electrical service, not the 200 amp service with 220 volts of electricity required to operate the car lifts used in K&P's business. It did not have concrete flooring required to safely operate a car repair business. Space 21 had no overhead doors in the back to provide access to lifts. It had only one overhead door and a pedestrian door in the front of the building.

5.      Space 19 had six overhead garage doors (three in the front and three in the back), open space for K&P's five car lifts, 200 amp electrical service, and concrete flooring. It had no partitions of any kind, no restroom and no pedestrian door.

6.      K&P used the partitioned areas of space 21 as an office for Parida and as storage space. The layout of the space was as it existed during the entire lease period is shown in Debtor's Exhibit 33, a three-dimensional model.

7.      There is no evidence that Argent ever complained that K&P was violating the lease by occupying both spaces. Argent wrote a letter dated May 20, 1992 to K&P about

building out space 21 in accordance with the Exhibit B of the lease (Pl. Ex. 5), entitled "Landlord's Work," which set forth the landlord's obligation to build out space 21. There is no evidence that Argent ever followed up on its letter or attempted to make any improvements to space 21 while it owned the property.

8.     On the north (rear) side of space 21, as shown in the model of the premises (Debtor's Ex. 33), there were two posts that protected an electrical box for the entire auto center. It would have been necessary to move this electrical box to allow access to all three garage doors planned in Exhibit B to the lease for the back of the space 21. Parida testified that Argent may have decided that it did not want to undertake the expense of moving the electrical box to another location. Whatever the reason, Argent did not make the improvements specified in Exhibit B of the lease and instead allowed K&P to remain in both spaces 19 and 21.

9.     On August 16, 1994, in connection with Argent's attempts to sell the service center, Parida executed an "estoppel letter" on behalf of K&P. The letter stated, among other things, that "Tenant has made no agreements with landlord or its agents or employees, concerning free rent, partial rent, rebate or rental payments or any other type of rental concession except as follows: will use the entire space until the modification is completed." (Debtor's Ex. 2.)

10.     In January 1995, Norcor acquired the auto service center from Argent Group subject to the existing leases, including K&P's lease.

11.     When Norcor assumed the Lease, none of the improvements listed in Exhibit B to the lease ("Landlord's Work") had been made.

-6-

12.    On October 17, 1994 and November 14, 1994, Newcastle demanded in writing that K&P execute an amendment to the lease increasing the rent to reflect the fact that K&P occupied both spaces 19 and 21. (Pl. Ex. 6, Debtor's Ex. 5) On March 7, 1995, because K&P refused to execute a lease amendment providing for a rent increase, Newcastle demanded that K&P vacate space 19, "as we will have our contractor at the center in the near future to install a demising wall and implement the other improvements required under the Lease." (Pl. Ex. 7.). K&P did not vacate space 19 in response to this letter and no contractor ever arrived at the property to perform any work.

13.    On October 23, 1995, Newcastle informed K&P in writing that a construction project to "bring your demised premises to conform with the space specified in your Lease" was "currently being bid" and was anticipated to begin on December 1, 1995. (Debtor's Ex. 6.) Newcastle demanded that K&P vacate space 19. Again, K&P did not vacate space 19 and Newcastle did not send a contractor to the auto center to build a demising wall.

14.    On January 26, 1998, Parida executed a second estoppel letter stating that "We are by this letter informing you that as of this date, no default or circumstance that could in the future give rise to a default under the terms of the said Lease exists to the best of our knowledge, information and belief." (Pl. Ex. 11.) It further provides that K&P "presently claims no credit, or setoff against rentals, and has no knowledge of any circumstances which will give rise to any credit or setoff against its obligation for present or future rentals. . . ." Id.

15.    On February 16, 2000, Newcastle demanded in writing that K&P either pay increased rent or vacate space 19. (Pl. Ex. 12.)

16.     On April 6, 2000, Newcastle again stated in writing that "If we do not receive, in our office, the executed amendment to lease prior to Monday April 10, 2000, we will be coming out to install a demising wall. You should have all of your belongings removed from this space so you can get to them after the wall is installed." (Pl. Ex. 13.) Again, no one was sent to the leased premises to perform any work.

17.     On June 28, 2000, Newcastle notified K&P in writing that it would begin to charge increased rent beginning March 1, 2000. (Pl. Ex. 14.) Newcastle stated that it would not charge retroactive rental payments for the previous years of occupancy.

18.     On July 6, 2000, Newcastle demanded in writing that K&P pay Newcastle $13,513.97 based on its claim that K&P defaulted under the rental provision of its Lease. (Debtor's Ex. 10.) Newcastle claimed K&P owed additional rent and late fees from March 2000 through July 2000.

19.     Newcastle never asked K&P to move out of space 21 only (while remaining in space 19) so that Newcastle could make improvements to Space 21.

20.     Newcastle never intended to perform the improvements required by Exhibit B to space 21 before attempting to require K&P to vacate space 19. Newcastle never got the building permit required to perform any modifications to space 21 required of the landlord under Exhibit B to the lease, and never sent anyone to the property to perform this work. Newcastle did not introduce into evidence any specific plans for completing this work or any contracts entered to perform this work.

21.     At no time during the lease period was space 21 usable for a car repair business. It did not have an adequate electrical supply for the operation of the lifts, it had only one

-8-

overhead garage door, the existing extensive interior partitions made it impossible to set up car lifts to perform car repairs in the space, and the floor covering made operation of a car repair business unsafe. K&P needed an overhead door for access to each lift.

22.    Although it is doubtful that K&P could have fit all of its lifts and other equipment into the non-partitioned spaces in space 21 as it existed during the entire time of K&P's tenancy, even if the equipment would have fit, it would have been physically impossible for Newcastle to make the improvements required under Exhibit B, which included demolishing walls, constructing new walls, and installing a concrete floor, while all of K&P's property was in space 21.

23.    From 1992 until it vacated the auto service center in 2001, K&P paid all rent due under the lease on time.

### IV.    Conclusions of Law

Newcastle claims that K&P breached the lease by refusing to vacate space 19 when Newcastle demanded it and by instead continuing to occupy both spaces 19 and 21 for the full term of the lease. Newcastle contends that the damages owed for this alleged breach are the rent Norcor would have received if space 19 had been rented to someone else, which Newcastle claims is $2,000 per month or $164,000 in total. Newcastle also contends that Parida's failure to pay these alleged damages was a breach of his guaranty of K&P's performance under the lease.

K&P argues that the lease permitted it to occupy both spaces 19 and 21 until the landlord substantially completed the improvements to space 21 listed in Exhibit B of the lease. Newcastle counters that K&P was initially permitted to occupy only space 19, not space 21, and that K&P

waived the landlord's obligations to complete improvements to space 21 by occupying space 21

(in addition to space 19) from the beginning of the lease term.   It therefore contends that K&P

was required to move out of space 19 upon demand even though no improvements were made to

space 21, and that K&P's failure to move out breached its obligations under the lease.


### A.    The Lease

The facts that matter in this case are largely undisputed.  The result in this case depends

on the construction of three key terms of the lease.

First, section 2.03 of the lease provides that the landlord will substantially complete

certain improvements before the tenant takes possession.  Section 2.03 also provides that the

tenant taking possession constitutes its acceptance of the condition of the premises.  Section 2.03

states, in relevant part:

> Landlord and Tenant hereby agree that Tenant's taking possession of the Premises
> shall be deemed conclusive evidence of Tenant's acceptance of the Premises in
> satisfactory condition and in full compliance with all covenants and obligations of
> Landlord in connection therewith.  Prior to the Possession Date, Landlord will
> substantially complete the construction of the Auto Service Center and the
> improvements in and to the Premises in accordance with Exhibit B attached hereto,
> all of which shall be completed at Landlord's expense.

Second, "Exhibit B" to the lease, entitled "Landlord's Work," lists the improvements

that "shall be performed by Landlord."  The list includes, among other things, the construction of

interior partitions, the installation of overhead garage doors in the front and rear of the space, the

installation of concrete flooring, the installation of an electrical system with 200-amp service,

and the construction of a demising wall between spaces 19 and 21.   Exhibit B includes a

-10-

diagram initialed by both parties that illustrates the specific improvements the landlord agreed to

make to space 21.

Third, "Exhibit I" to the Lease provides that although the lease is for the rental of space

21, K&P will initially occupy the adjacent space 19. "Exhibit I" provides in full:

> Landlord and Tenant acknowledge that although this lease is for the space commonly
> known as 21 South in Fox Valley Auto Care Center, Aurora Illinois, that *tenant will*
> *initially occupy and use space known as 19 South.* Tenant and Landlord agree [to]
> cooperate during the construction time necessary *to divide the current space into*
> *separate spaces and then subsequently move the tenant from 19 South to 21 South.*
> Tenant agrees to cause its equipment and fixtures to be moved from space 19 to
> space 21 upon reasonable notice from Landlord. Tenant acknowledges that this will
> take place over a period of several months, including time necessary to obtain
> necessary building permit from the city of Aurora. Landlord agrees to use due
> dilegence [sic] and care in its construction so as to cause minimum disruption to
> Tenant's business. [emphasis added]

### B.    Reconciling the Lease Provisions

The court must interpret these three provisions to determine whether K&P breached the

lease by refusing to vacate space 19 upon receiving a demand from Newcastle, even though

Newcastle had not made the improvements to space 21 required under section 2.03 and Exhibit B

of the lease.

The main objective of contract interpretation is to give effect to the intention of the

parties. Srivastava v. Russell's Barbecue, Inc., 523 N.E.2d 30, 33 (Ill. App. Ct. 1988). Contracts

should be interpreted as a whole, giving meaning and effect to each provision. Arrow Master,

Inc. v. Unique Forming Ltd., 12 F.3d 709, 713 (7th Cir. 1993) (citing Mayfair Const. Co. v.

Waveland Assoc. Phase I Ltd. P'ship, 619 N.E.2d 144, 152 (Ill. App. Ct. 1993)). In construing

the contract, it is presumed that all provisions were included for a purpose; any conflicting

provisions should be reconciled if possible so as to give effect to all of the contract's provisions. Id.

Illinois applies the "four corners" approach to contract interpretation, which requires the court to look first to the language of the contract. The court should give clear and unambiguous language its ordinary and natural meaning and strive to avoid absurd or unreasonable results. Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Telephone Co., 491 F.3d 685, 688 (7th Cir. 2007); Mathews v. Sears Pension Plan, 144 F.3d 461, 466 (7th Cir. 1998).

If the language in the document is unambiguous, construing the contract is a question of law. Anand v. Marple, 522 N.E.2d 281, 282 (Ill. App. Ct. 1988). If the language is subject to more than one reasonable interpretation or is inconsistent on its face, the contract is ambiguous, and further factual inquiry may be necessary to determine the parties' intent. See Hessler v. Crystal Lake Chrysler-Plymouth, Inc., 788 N.E.2d 405, 413-14 (Ill. App. Ct. 2003). In that circumstance, extrinsic evidence may be admitted to interpret the ambiguous terms. Fed. Deposit Ins. Corp. v. W.R. Grace & Co., 877 F.2d 614, 620 (7th. Cir. 1989). Extrinsic evidence is evidence relating to the contract that does not appear on its face, such as statements or communications between the parties, the surrounding facts and circumstances existing at the time the contract was executed, or the parties' subsequent conduct. See Harris Trust & Savings Bank v. LaSalle Nat. Bank, 567 N.E.2d 408, 412 (Ill. App. Ct. 1990); Mid-City Industrial Supply Co. v. Horwitz, 476 N.E.2d 1271, 1276 (Ill. App. Ct. 1985); Ancraft Products Co. v. Universal Oil Products Co., Inc., 427 N.E.2d 585, 587 (Ill. App. Ct. 1981); Farwell Constr. Co. v. Ticktin, 405 N.E.2d 1051, 1056 (Ill. App. Ct. 1980).

-12-

Applying these rules of contract interpretation, the court first considers the language of the lease and finds that there is no unreasonable ambiguity or conflict. Section 2.03 and Exhibit I, which set forth the parties' agreement regarding the sequence of their obligations under the lease, can be reconciled in a reasonable manner.

Section 2.03 appears to have been drafted under the assumption that the landlord would make all improvements required to space 21 before K&P moved into the auto center. It provides that the landlord will substantially complete the construction in accordance with Exhibit B "prior to the Possession Date." It also provides that K&P taking possession of space 21 "shall be deemed conclusive evidence of Tenant's acceptance of the Premises" in full compliance with the covenants and obligations of the landlord under the lease. In other words, section 2.03 contemplates that the improvements would be made by the landlord before K&P moved into the center and that, by moving into space 21, K&P would be agreeing that the landlord had substantially completed the improvements required under Exhibit B.[1]

Exhibit I shows, however, that the parties agreed that K&P would in fact move into the auto center before Argent completed the required improvements to space 21. Exhibit I modifies the provisions in section 2.03 discussed above by providing that, although the lease is for space 21, K&P will initially occupy and use space 19. It further requires the parties to cooperate while the landlord completes the required construction, at which time K&P will move out of space 19 and will occupy only space 21.

---

[1]Consistent with this concept, the "Possession Date" on page one of the lease is defined as the date on which the landlord's work is substantially complete and the premises is available to the tenant.

-13-

Section 2.03, Exhibit B and Exhibit I can be harmonized to provide for the following sequence of events before K&P had to vacate space 19. First, as Exhibit I expressly provides, K&P would move temporarily into space 19 (in addition to space 21, as discussed below), which was suitable for repairing cars. Then, under section 2.03 and Exhibit I, the landlord would obtain the necessary permit and substantially complete the improvements to space 21 that are listed in Exhibit B. After substantial completion of the improvements, in accordance with Exhibit I, the landlord would give "reasonable notice" to K&P that it must vacate space 19 and move into space 21. After K&P moved into the improved space 21, under section 2.03, K&P's possession of space 21 would be deemed K&P's agreement that the landlord had substantially completed the improvements required under section 2.03 and Exhibit B.

Interpreting the three key provisions in this manner gives effect to each provision and produces neither a strained interpretation nor unreasonable results. It provides a logical way for the parties to allow K&P to begin operating its business at the center and for the landlord to start collecting rent from K&P before the landlord undertook the expense of completing the changes required for space 21.

Newcastle argues for a far more strained interpretation of the lease that would eliminate the landlord's obligation to make space 21 suitable for K&P's business. It first contends that Exhibit I permitted K&P to occupy *only* space 19, not space 19 *and* space 21. It relies on the first sentence of Exhibit I, which provides that "tenant will initially occupy and use space known as 19 South." It then relies on the first sentence of paragraph 2.03, which provides that the tenant's taking possession of the "premises" (space 21) "shall be deemed conclusive evidence" that the landlord complied with its obligations under Exhibit B to improve space 21. Thus, Newcastle

-14-

contends that, by taking possession of space 21 (in addition to space 19) when it moved into the property, K&P gave "conclusive evidence" that the landlord had substantially performed all the improvements to space 21 required under Exhibit B, even though it is undisputed that those improvements were never made.

This argument is not persuasive for several reasons. First, interpreting Exhibit I and the first sentence of section 2.03 in this manner is unreasonable because it effectively nullifies the important covenants the landlord undertook later in paragraph 2.03 and in Exhibit B to improve space 21. Those improvements were necessary to transform space 21 into the usable work space depicted in Exhibit B. Such an unreasonable result should be avoided in favor of the more reasonable interpretation discussed above that gives effect to all the provisions of section 2.03 and Exhibit I and preserves the essential rights of both parties under the lease.

Second, Newcastle's construction of these provisions completely ignores the second sentence in section 2.03, which required the landlord to complete all the improvements before the tenant moved in. The first and second sentences of section 2.03 worked together to insure that the tenant got the improvements it was promised and the landlord was provided with a clear means of establishing that it had satisfied its construction obligations. These provisions should not be construed to allow the landlord to defeat entirely the tenant's right to improvements that were essential to the operation of its business. Instead, as discussed above, a more reasonable interpretation applies the second sentence of section 2.03 when the tenant moved into space 21 after the improvements required in Exhibit B were made by the landlord.

Finally, Newcastle's construction ignores the full text of Exhibit I, which permits K&P to occupy both spaces until the improvements were completed. Newcastle focuses only on the first

-15-

sentence of Exhibit I stating that K&P will initially occupy and use space 19. It ignores the next sentence, which provides that the tenant and landlord "agree [to] cooperate during the construction time necessary *to divide the current space into separate spaces* and then subsequently move the tenant from 19 South to 21 South." The "current space" to be divided can only refer to both spaces 19 and 21 together and refers to the space that K&P would occupy at the inception of the lease before the construction work was performed. K&P's right to occupy both spaces was expressly subject to its obligation to cooperate with the landlord's construction activities in space 21. Newcastle's interpretation of Exhibit I completely ignores the "current space" language and effectively inserts the word "only" in the first sentence of Exhibit I so that it would permit K&P to occupy only space 19.

Interpreting Exhibit I as a whole and give meaning to all of its words, Exhibit I gives K&P right to occupy spaces 19 and 21 until the improvements were made to space 21, at which time the joint space would be divided. K&P was not obligated to move out of space 19 until Newcastle completed the improvements to space 21 required under Exhibit B of the lease. Because Newcastle never made any of the essential improvements to space 21, K&P was never obligated to vacate space 19. Therefore, K&P's failure to vacate space 19 or pay extra rent on space 19 was not a breach of the lease.

## C.   Extrinsic Evidence

The court's interpretation of the contract is based on the language of the lease itself, which can be reconciled in a reasonable way without the benefit of extrinsic evidence. Even if

extrinsic evidence is considered, however, that evidence strongly supports the court's

interpretation of the lease.

### -1992 Letter from Landlord

First, a letter dated May 20, 1992 from Argent Group, the original landlord, shows that

the parties agreed that K&P would use both spaces when they entered into the lease agreement.

The letter states:

> As you know we have discussed your space several times in the last weeks. You are
> currently using all six bays and only paying for three of them. I would like you to
> call me and make an appointment so that we can discuss your space arrangements
> and get going on whatever build out is necessary. As you know we have complete
> plans and permits to build out the space for a three-bay configuration. . . . Please
> call me as soon as possible so that we can get this process under way.

This letter demonstrates that Argent knew that K&P was occupying both spaces, and that

Argent did not believe that K&P's use of space 21 violated the lease or waived Argent's

obligation to make improvements to space 21. Argent implicitly recognized that it had to build

out space 21 before it could require K&P to move out of space 19. The letter also implicitly

recognizes K&P's obligation under Exhibit I to cooperate with Argent during the construction

period. Thus, this letter, which was written in the fifth month of the lease period, strongly

supports the court's interpretation of the lease.


### -Physical Attributes of Both Spaces

Second, the physical realities of the space when the lease was entered support the view

that K&P was intended to occupy both space 19 and 21 until the construction improving space 21

was complete. When the Lease was executed, the "current space" referred to in Exhibit I

consisted of both spaces 19 and 21. The boundary between them was not physically delineated in any way. Space 19 had an adequate electrical supply, car lifts, concrete flooring, and overhead rear doors, so it was suitable for K&P's repair operations. It had no pedestrian entrance, however, and no restroom. In contrast, space 21 was unsuitable for a car repair operation. Much of it was subdivided into small interior offices and a conference room that did not leave space for K&P's five car lifts. In addition, the electrical supply was inadequate to operate the lifts, there was no concrete flooring and no rear overhead garage doors allowing access to lifts, and there was only one overhead door in the front of the space. On the other hand, space 21 had the only pedestrian entrance to the premises and the only restroom. K&P needed the open space, garage door access to lifts, 200 amp electrical service and concrete flooring in space 19, as well as the restroom and pedestrian entrance in space 21, to operate its business. It could not have operated without a bathroom or a pedestrian door in space 21 for the "several months" contemplated in Exhibit I for completion of the construction.

Thus, at the time the lease was signed, neither space 19 nor space 21 had the minimum necessary features for K&P to operate its business in just one of those spaces. These physical realities support the conclusion that the parties intended that K&P use both space 19 and 21 until space 21 could be improved to permit all of K&P's operations to take place just in space 21.[2]

### -Estoppel Certificates

---

[2] Exhibit B illustrates that the improved space 21 would have had all of these essential elements.

-18-

The parties also presented two "estoppel certificates" as extrinsic evidence of the intent of the parties. Parida executed both certificates on behalf of K&P. Each party argues that one of the certificates supports its position. On August 16, 1994, before Norcor purchased the property, Parida signed an estoppel certificate that stated, "Tenant has made no agreements with landlord or its agents or employees, concerning free rent, partial rent, rebate or rental payments or any other type of rental concession except as follows: *will use the entire space until the modification is completed.*" (emphasis added). Debtors point to this certificate as proof of K&P's right to use both spaces.

On January 26, 1998, Parida signed a second estoppel certificate that stated, "The undersigned presently claims no credit, or setoff against rentals, and has no knowledge of any circumstances which will give rise to any credit or setoff against its obligation for present or future rentals[.]" It also states that K&P knows of "no default or circumstance that could in the future give rise to a default" under the lease. Newcastle argues that this certificate shows that K&P accepted space 21 as being in satisfactory condition and in full compliance with all of the landlord's obligations under the lease.

Neither estoppel certificate is particularly persuasive evidence of the intent of Argent and K&P when they entered into the lease. Both were signed long after the lease was executed. The first letter provides some support for K&P's assertion that it had the right to occupy both spaces until the build-out of space 21 was complete. The second letter provides no relevant evidence either way. While it does not contain the "right to occupy both spaces" language that Parida included in the 1994 letter, it does not make any concessions regarding that right either.

First, K&P's statement that it claims no credit or setoff against rent is correct but meaningless. K&P has never contended that it had the right to a credit or set off against rent arising from the landlord's failure to make the required improvements to space 21. Instead, K&P has contended, as set forth in the first estoppel letter, that it had the right to occupy both spaces until space 21 was improved.

Second, the statement that K&P knew of no default or circumstance that could give rise to a default in the future is equally uninformative and does not support Newcastle's argument that K&P waived its right to the improvements described in Exhibit B by occupying space 21. As discussed above, under Exhibit I, K&P could use both spaces until the improvements were made to space 21. If the improvements were not made, K&P could remain in both spaces for the rent provided in the lease. Since K&P was occupying both spaces for the rent specified in the lease, it had no reason to complain about a default by Newcastle based on the failure to make the improvements in Exhibit B. Newcastle's last attempt to force K&P to move from space 19 into the unimproved space 21 was in 1995, three years before Parida signed the second estoppel letter. In 1998, K&P had no reason to believe that the current situation would not continue for the remainder of the lease, with Newcastle failing to make the improvements required under Exhibit B and K&P retaining the right to occupy both spaces. Thus, K&P's statement that it did not know of or anticipate any future defaults under the lease was not a concession by K&P that space 21 was improved in compliance with the landlord's obligations under Exhibit B.

For all of these reasons, the relevant extrinsic evidence supports the conclusion that the lease permitted K&P to occupy spaces 19 and 21, subject to K&P's obligation to cooperate while the landlord made the improvements to space 21 required by the lease. There is no evidence,

extrinsic or otherwise, that supports Newcastle's argument that the parties intended that K&P's

use of space 21 before the build-out was completed would result in a forfeiture of K&P's right to

have space 21 modified in accordance with Exhibit B to the lease.

### D.    K&P's Duty to Cooperate

Newcastle also argues in its post-trial brief that K&P prevented it from constructing the

required improvements in space 21 by continuing to operate its business from space 21. While

this was not the focus of its argument at trial, Newcastle now contends that "a party cannot take

advantage of a condition precedent which he has rendered impossible or complain of a failure to

perform which he has himself prevented." Lukasik v. Riddell, Inc.,116 Ill. App. 3d 339, 346 (Ill.

App. Ct. 1983). Newcastle relies on a stipulation by K&P that it needed to vacate space 19 to

permit Newcastle to build a demising wall and that K&P refused to vacate space 19. This

argument fails for several reasons.

First, this argument assumes that Newcastle asked K&P to stop using space 21 so it could

make improvements to space 21. That never happened. K&P never asked K&P to vacate *space

21* so that it could make the improvements required to *space 21*. Instead, all of Newcastle's

letters demanded the opposite - that K&P vacate space 19 and move *into space 21* before any

work was done on space 21.

Second, the stipulation upon which Newcastle relies makes no reference to the timing of

the build-out of space 21 and does not in any way negate Newcastle's obligation to make those

improvements before K&P had to vacate space 19. Because the contract did not require K&P to

vacate space 19 before any improvements were made to space 21, K&P's failure to vacate space 19 does not excuse Newcastle's failure to perform the build-out.

Third, this argument has no merit because Newcastle never intended to make the improvements required to space 21. Although Newcastle sent many letters threatening to install a demising wall and demanding the payment of additional rent, only one letter even suggests that it was willing to make any improvements to space 21. That letter, dated March 6, 1995, demanded that K&P "remove all of your property and equipment to [space 21] as we will have our contractor at the center in the near future to install a demising wall and implement the other improvements required under the Lease." (Pl. Ex. 7.) Though the letter referred to making unspecified improvements required by the lease, it also demanded that K&P *first* vacate space 19 and move into space 21 before any work began.

Instead of suggesting that Newcastle intended to improve space 21, the March 6 letter suggests the opposite - that Newcastle had no intention of making the improvements to space 21. Assuming that K&P could have fit all of its equipment into space 21 despite the large partitioned area in the center, it would have been virtually impossible to make the improvements necessary under Exhibit B. A contractor could not have installed a concrete floor, removed the many existing partitions and installed new ones, or performed the many other improvements required by Exhibit B while the space was packed with K&P's equipment. If Newcastle had any intention of making the extensive improvements to space 21 set forth in Exhibit I, it would have asked K&P to vacate space 21, not to move its equipment into the space. Thus, the March 6 letter, while it refers to potential construction beyond a demising wall, supports the conclusion that Newcastle did not intend to improve space 21 in accordance with Exhibit B to the lease.

-22-

None of the other letters sent by Newcastle to K&P refers to any potential construction project besides the demising wall. The letters either demanded that K&P vacate space 19 so that Newcastle could build the demising wall or that K&P pay additional rent to remain in both spaces. They do not show any intent by Newcastle to make improvements to space 21. Instead, because Newcastle knew that K&P could not operate its business in space 21 without the improvements (so Newcastle could not have expected K&P to move voluntarily into space 21), these letters seem intended simply to pressure K&P into paying additional rent for space 19.[3]

Much of the testimony of Newcastle's sole witness is consistent with the conclusion that Newcastle never intended to build out space 21 in accordance with Exhibit B. Newcastle's manager admitted that Newcastle never got the required building permit and never sent a contractor to the site. He never acknowledged that Newcastle had an obligation to build out space 21 before K&P had an obligation to move out of space 19. He also never testified that he or anyone else asked K&P to move out of space 21 so they could make the improvements required by Exhibit B. Instead, he testified that he first tried to get K&P to sign a new lease requiring K&P to pay additional rent for space 19, and he then threatened to build a wall separating spaces 19 and 21 so that Newcastle could rent space 19 to someone else. His testimony made clear that everything he did was intended to get more money for space 19 without having to spend any money to improve space 21. He gave no credible testimony that

_____

[3]In an October 23, 1995 letter, Newcastle said that it intended to "bring your demised premises into conformance with the space specified in the lease." (Pl. Ex. 9.) While this sentence is confusing (the demised premises was by definition the space identified in the lease), Newcastle intended to force K&P out of space 19 and into space 21, not to make any improvements to space 21. All the remaining letters simply demand that K&P vacate space 19 so that Newcastle can build the demising wall and rent space 19 to someone else, or that it sign a lease for space 19 and pay additional rent for it. (Pl. Ex. 6, 7, 12, 13, and 14, Debtor's Ex. 5).

Newcastle was ever willing and ready to make the improvements required under Exhibit B of the lease. He also did not produce any contract or construction plans to support Newcastle's post-trial contention that it was prepared to make the required improvements to space 21.

For all of these reasons, Newcastle's argument that it would have made the improvements to space 21 but that K&P prevented it from doing so in violation of K&P's duty to cooperate during construction has no merit.

### E.    Noncontractual Theories

Newcastle filed a proof of claim asserting "breach of lease agreement." In the joint pretrial statement the court required the parties to file before trial, Newcastle asserted that its claims against K&P are breach of written contract, breach of implied contract at law, unjust enrichment and use and occupancy pursuant to 735 ILCS 5/9-210(2).    At trial, however, Newcastle's counsel stated that it was pursuing only the breach of written contract claim.

Nonetheless, at trial and in its post-trial brief, Newcastle argued that K&P had an "implied duty at law" to pay rent based on the rental value of space 19 (in addition to the rent owed under the lease), presumably in support of its claim of breach of implied contract at law. Newcastle relies on cases holding that when a tenant occupies premises after being notified that he is expected to pay rent, he is liable to pay the rent demanded. Illinois Cent. R. Co. v. Thompson, 5 N.E. 117 (Ill. 1886) and Jackson v. Reefer, 201 Ill. App. 29 (3rd Dist. 1915). Both cases cited by Newcastle, however, involve claims for rent where there was no agreement between the parties. They do not apply in this case because there is a written lease between the

-24-

parties and the lease permits K&P to occupy both spaces while paying the agreed rent until the improvements to space 21 are completed.

By failing to pursue any other basis for recovery at trial or in its post-trial brief, Newcastle has waived any such claims. The court notes that, in any event, Newcastle may not pursue noncontractual claims where a specific contract governs its landlord-tenant relationship with K&P. People ex rel. Hartigan v. E&E Hauling, 607 N.E.2d 165 (1992); Zadrozny v. City Colleges of Chicago, 582 N.E.2d 44, 48 (Ill. App. 1991).

### F.    Guaranty Claim against Parida

Newcastle also asserts a claim against Parida based on his guaranty of K&P's performance under the lease. Because K&P has no liability to Newcastle for breach of the lease, Parida is not liable on the guaranty.

### G.    Debtor's Other Claims

The debtors argued that another basis for disallowing Newcastle's claim is that, even if K&P is found to have breached the lease, Newcastle has no right to damages because it also breached the lease by failing to perform various obligations. Because the court has already concluded that K&P did not breach the lease, there is no need to address these issues.

## V.    Conclusion

For the reasons stated above, the court will disallow Newcastle's claims against K&P and

Parida.

February 24, 2009                                   ENTERED:

_____

CAROL A. DOYLE
United States Bankruptcy Judge